**AUGUSTINE MEDICAL, INC.,**
**Plaintiff–Cross Appellant,**

**v.**

**GAYMAR INDUSTRIES, INC.**
**and Medisearch P R, Inc.,**
**Defendants–Appellants,**

**and**

**Mallinckrodt Group, Inc. and**
**Mallinckrodt Medical, Inc.,**
**Defendants–Appellants.**

Nos. 98–1001, 98–1002, 98–1054, 98–1244, 98–1266.

United States Court of Appeals, Federal Circuit.

June 8, 1999.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Aug. 6, 1999.

J. Randall Benham, Augustine Medical, Inc., of Eden Prairie, Minnesota, argued for plaintiff-cross appellant. With him on the brief were Jacob M. Holdreith, Craig J. Lervick, and Robert M. Rauker, Oppenheimer, Wolff & Donnelly LLP, of Minneapolis, MN.

Robert J. Lane, Jr., Hodgson, Russ, Andrews, Woods & Goodyear, LLP, of Buffalo, New York, argued for defendants-appellants Gaymar Industries, Inc., et al.

Raymond A. Kurz, Rothwell, Figg, Ernst and Kurz, of Washington, D.C., argued for defendants-appellants Mallinckrodt Group, Inc., et al. With him on the brief was G. Franklin Rothwell.

Before MAYER, Chief Judge, RADER, and GAJARSA, Circuit Judges.

RADER, Circuit Judge.

Augustine Medical, Inc. filed two separate lawsuits, one against Mallinckrodt Group, Inc. and Mallinckrodt Medical, Inc. (collectively, Mallinckrodt), and another against Gaymar Industries, Inc. and Medisearch P R, Inc. (collectively, Gaymar). Each lawsuit alleged infringement of Augustine Medical's U.S. Patent Nos. 5,300,-102 (the '102 patent), 5,324,320 (the '320 patent), 5,405,371 (the '371 patent), 4,572,-188 (the '188 patent), and 5,350,417 (the '417 patent) (collectively, the Augustine patents). The Augustine patents claim features of convective (or forced-air) thermal blankets. The United States District Court for the District of Minnesota consolidated these separate suits for trial. Before trial, the district court granted summary judgment of invalidity of several asserted claims and non-infringement of others. At trial, a jury found infringement of the remaining claims under the doctrine of equivalents. Accordingly, the district court issued a permanent injunction prohibiting Mallinckrodt and Gaymar from making certain convective thermal blankets.

Because prosecution history estoppel limits application of the doctrine of equivalents to the asserted claims, this court reverses the district court's failure to grant judgment as a matter of law (JMOL) of non-infringement and vacates the entry of the permanent injunction. In addition, because the July 10, 1990 parent application does not provide sufficient support for claims 1, 3, 4, and 8 of the '371 patent, this court affirms the district court's decision that those claims are invalid under 35 U.S.C. § 102(b) (1994). This court also affirms the district court's summary judgment of non-infringement on the '188 patent. Finally, this court affirms the dismissal of Gaymar's invalidity claim on the '417 patent.

I.

Convective thermal blankets inflate to direct warm (or cool) air onto a person. Surgeons often use these blankets during and after an operation to prevent or treat hypothermia caused by surgical conditions. Hypothermia results when a patient's body temperature drops below a certain threshold. Surgery often presents the threat of hypothermia. A patient's body temperature may drop significantly during surgery because anesthesia prevents the patient's body from regulating its own temperature. Additionally, operating rooms – kept cool to accommodate the surgeon's working conditions and to reduce the spread of germs – can chill patients. Moreover, surgery often calls for administration of cool intravenous fluids at a time when the patient's body cavity is open.

A convective thermal blanket over the patient is thus necessary to prevent or treat hypothermia during and after surgery. Heated air from a warming unit inflates the blanket. Once inflated, the blanket directs heated air onto the patient

through small holes (or "exit ports") in the undersurface of the blanket. With careful use, a convective blanket regulates patient temperature and prevents hypothermia.

The Augustine patents all stem from related applications and claim features in a particular convective thermal blanket design. Dr. Scott D. Augustine developed these features. The Augustine blanket design contains a series of hollow tubes with rounded upper surfaces and flattened lower surfaces joined in a parallel array. The geometric design of this structure allows it to "self-erect" when inflated and helps the blanket perform its function of warming the patient. According to the earliest of the Augustine patents, the '188 patent, the Augustine blanket has a "self-supporting structure having a generally rounded or elliptical cross-sectional shape which con-

tacts the patient only at the tubes which are immediately adjacent the keystone tube." Col. 4, ll. 12–16. When in use, air pressure from the exit ports raises these tubes slightly above the patient so that none of the tubes are in contact with the patient. This slight gap between the patient and the blanket facilitates "circulation ... through those exit ports." Col. 4, ll. 16–20. According to the specifications of the other three Augustine patents, the inflated blanket "erects itself into a Quonset hut-like structure." The '102 patent, col. 3, ll. 31–35, 49–50; the '320 patent, col. 3, ll. 11–12, 20–22; the '371 patent, col. 4, ll. 10, 17–19. Figures in each of the Augustine patents illustrate this self-supporting, Quonset hut-like structure. Figure 2 of the '188 patent is representative.

FIG. 2

Mallinckrodt and Gaymar manufacture and sell convective warming blankets to prevent or treat hypothermia. Mallinckrodt's and Gaymar's blankets (the accused blankets) are similar to each other in construction. The accused blankets feature an inflatable quilt-like structure. The accused blankets attach two sheets of the same amount of flexible, lightweight material around their periphery and at various spots along their surfaces. In operation, heated air flows onto a patient's body from holes in the undersurface of the accused blankets, but the blankets do not form a self-supporting or Quonset hut-like struc-

ture. Instead, the accused blankets lie flat when inflated on a flat surface and rest substantially on a patient when in use. Mallinckrodt began selling its first model of convective warming blanket in June 1992. Gaymar began selling forced-air blankets in March 1992.

In October 1994, after issuance of the '102 and '320 patents in April and June 1994, Augustine Medical filed separate lawsuits against Mallinckrodt and Gaymar, initially alleging infringement of these two patents only. Augustine Medical later amended its original complaint to assert

infringement of the '371, '188, and '417 patents as well.

After consolidation of these lawsuits in the district court, Mallinckrodt and Gaymar moved for partial summary judgment, seeking a declaration of invalidity as to claims 1, 3, 4, and 8 of the '371 patent. The district court referred the case to a magistrate judge for recommendations. The magistrate judge concluded that the display of a prototype blanket triggered a § 102(b) on-sale bar. In reaching that conclusion, the magistrate judge found that the parent application Serial No. 07/550,757 (the '757 application), which was filed within one year after the display, did not sufficiently describe the invention of these claims of the '371 patent. Thus, the magistrate judge accorded these claims the January 8, 1991 filing date of their continuation-in-part (CIP) application, not the June 10, 1990 filing date of the '757 application. With that finding in place, the magistrate judge recommended granting the summary judgment motion because Augustine Medical had "displayed, sold and distributed a written description of the device" embodying these claims more than one· year before the effective filing date of the claims. The district court adopted the magistrate judge's Report and Recommendation and invalidated these claims.

In the fall of 1996, Augustine Medical signed a stipulation of dismissal with prejudice of all infringement claims arising out of the '417 patent. Augustine Medical further stipulated that none of Gaymar's products infringe any claim of the '417 patent. Based on these stipulations, the magistrate judge discerned no actual controversy amongst the parties concerning the '417 patent, thereby mooting Gaymar's claim that the '417 patent was invalid. The district court adopted this conclusion.

Before trial, both Gaymar and Mallinckrodt moved for partial summary judgment of non-infringement of the remaining claims of the '188, '102, '320, and '371 patents. In part, Gaymar and Mallinckrodt based these motions on prosecution

history estoppel. With respect to the '188 patent, the district court granted summary judgment of non-infringement in favor of both Mallinckrodt and Gaymar. In this judgment, the district court followed the magistrate judge's recommendation. The magistrate judge had first construed the claims and found, based on that interpretation, that the accused blankets did not literally infringe the '188 patent as a matter of law. Then, based on the "all elements rule," *see Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 935, 4 U.S.P.Q.2d 1737, 1739–40 (Fed.Cir.1987) (en banc); *Warner–Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146, 41 U.S.P.Q.2d 1865, 1871 (1997), the magistrate judge stated that application of the doctrine of equivalents to the claims of the '188 patent would render some of the claim elements meaningless. Specifically, because interpreting the claims as advocated by Augustine Medical would eliminate the claim limitations of "flattened," "substantially smooth," and "parallel array of hollow tubes," the district court found that the accused blankets did not infringe the '188 patent under the doctrine of equivalents.

With respect to the other patents, the magistrate judge detected a genuine issue of material fact relative to the "self-erecting" limitation. Specifically, the magistrate judge noted that "the Mallinckrodt blanket move[d] slightly away from the person underneath it and assume[d] a shape over the person" when in operation. When considering the Gaymar blanket, the magistrate judge explained that "the blanket lift[ed] slightly away from the table as it [was] inflated." The magistrate judge also concluded that two other elements of the Augustine Medical patent claims, a non-inflatable erectable foot drape and a non-inflatable extension at the head end, were present in Gaymar's blankets.

Based on the magistrate judge's Report and Recommendation of July 18, 1997, the district court granted the motions for sum-

mary judgment of non-infringement with respect to the '188 patent, but denied the motions with respect to the '102, '320, and '371 patents (the remaining patents in suit). The district court identified the same issue of material fact regarding whether Gaymar's and Mallinckrodt's blankets literally or equivalently self-erect. Neither the magistrate judge nor the district court substantively addressed the prosecution history estoppel defense.

The district court ordered a seriatim trial on the remaining patents in suit, with the first phase to determine infringement and willfulness and the second phase to determine damages, if necessary. At trial, the most contested issue between the parties was the meaning of the term "self-erecting." The district court determined that this limitation is either explicitly or implicitly present in each of the disputed patent claims of the '102, '320, and '371 patents. The magistrate judge had defined "self-erecting" to mean that the "blanket forms a structure around the patient when it is inflated." Rather than adopt the magistrate judge's interpretation, however, the district court, in its instructions to the jury, interpreted the term to require "that the device form a curved or arched structure which stands off the patient."

After trial, the jury returned a verdict finding that Mallinckrodt and Gaymar had not literally infringed any of the patent claims, but had infringed all of the asserted claims under the doctrine of equivalents. Based on this verdict, the district court entered a permanent injunction prohibiting both Gaymar and Mallinckrodt from making, using, or selling certain forced-air warming blankets.

Mallinckrodt and Gaymar both appeal the entry of the permanent injunction. Gaymar and Mallinckrodt also each sought judgment as a matter of law or a new trial under Fed.R.Civ.P. 50(b) and 59. Because these post-trial motions remained pending before the district court at the time of the appeal, the parties appealed under 28 U.S.C. § 1292(a)(1) and (c)(1) (1994). The district court later denied the parties' post-trial motions. Gaymar also appeals the dismissal of its claim of invalidity with respect to the '417 patent. Augustine Medical cross-appeals the grant of summary judgment of invalidity with respect to claims 1, 3, 4, and 8 of the '371 patent and challenges the district court's construction of the "self-erecting" limitation.

## II.

■ Because a correct infringement analysis requires a correct claim interpretation, see Markman v. Westview Instruments, Inc., 52 F.3d 967, 976, 34 U.S.P.Q.2d 1321, 1326 (Fed.Cir.1995) (en banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); Key Manufacturing Group, Inc. v. Microdot, Inc., 925 F.2d 1444, 1448, 17 U.S.P.Q.2d 1806, 1809 (Fed. Cir.1991); SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 885, 8 USPQ2d 1468, 1474 (Fed.Cir.1988), this court begins its review of the jury's verdict with a review of the district court's claim interpretation. This court reviews the district court's claim construction without deference. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454–56, 46 U.S.P.Q.2d 1169, 1172–75 (Fed.Cir.1998) (en banc); Markman, 52 F.3d at 979–81.

■ The primary issue of claim interpretation is the meaning of "self-erecting." Discharging its duty to give meaning to the claims, the district court instructed the jury that the term "self-erecting" required "that the device form a curved or arched structure which stands off the patient." Augustine Medical argues that "self-erecting" requires only that the blanket form an "environment" about the patient in which warm air can circulate. Under its proposed claim interpretation, Augustine Medical argues that the accused blankets literally "self-erect" because they create an environment of circulating warm air about a patient.

This court finds no support for Augustine Medical's claim construction. The patents themselves define what the claims mean by "self-erecting." As noted above, the '188 patent describes its structure as "a self-supporting structure having a generally rounded or elliptical cross-sectional shape which contacts the patient only at the tubes which are immediately adjacent the keystone tube." Col. 4, ll. 12–16. The other patents all explain that a blanket which "self-erects" "erects itself into a Quonset hut-like structure" when inflated. The '102 patent, col. 3, ll. 31–35; the '320 patent, col. 3, ll. 11–12, 20–22; the '371 patent, col. 4, ll. 10, 17–19. Thus, the district court correctly construed the term "self-erecting" to require that the accused blankets "form a curved or arched structure which stands off the patient." Following this interpretation, the jury found that the accused blankets did not literally infringe. The jury did, however, find infringement under the doctrine of equivalents.

■ As noted earlier, the accused blankets are made of a flexible, lightweight material which rests substantially on a patient when in use. When inflated, air exits through ports in the bottom of the blanket and passes over the patient's body. The evidence suggests that the accused blankets raise slightly away from the patient's body in the areas adjacent to the exit ports. The magistrate judge noted that "while viewing the inflation of the Mallinckrodt device in court and on video, ... the Mallinckrodt blanket move[d] slightly away from the person underneath it and assume[d] a shape over the person." When considering the Gaymar blanket, the magistrate judge explained that "the blanket lift[ed] slightly away from the table as it [was] inflated." Because the accused blankets assume the contours of, and rise slightly above, the patient's body, Augustine Medical contends that there is substantial evidence to support the jury's finding that the accused blankets at least contain an equivalent to the claimed "self-erecting" limitation.

■ In reviewing challenges to the sufficiency of the evidence supporting a jury verdict of infringement under the doctrine of equivalents, this court determines whether substantial evidence supports the jury's findings. See Texas Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1567, 39 U.S.P.Q.2d 1492, 1499 (Fed.Cir.1996). Although the doctrine of equivalents may occasionally extend the reach of a claim beyond its literal scope, several principles strictly limit application of the doctrine. For instance, the "all elements" rule provides the analytical framework for conducting an infringement analysis under the doctrine of equivalents that avoids undue expansion of a patent's claims. See Litton Sys., Inc. v. Honeywell, Inc., 140 F.3d 1449, 1454, 46 U.S.P.Q.2d 1321, 1324 (Fed.Cir.1998). Prosecution history estoppel also limits undue expansion of a claim's scope through the doctrine of equivalents. See Warner–Jenkinson, 117 S.Ct. at 1047, 1049–51. Specifically, prosecution history estoppel prevents a patentee from recapturing subject matter surrendered during prosecution of the patent. See id.; Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579–81, 34 U.S.P.Q.2d 1673, 1679 (Fed.Cir.1995). The application of prosecution history estoppel is a question of law which this court decides without deference to the district court. See Cybor, 138 F.3d at 1460.

■ To determine the scope of estoppel, this court examines objectively whether a competitor would reasonably conclude that an applicant's prosecution conduct had surrendered the disputed subject matter. See Cybor, 138 F.3d at 1457 ("The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter."). "Either amendments or arguments made by an applicant may be the basis for this conclusion." Litton, 140 F.3d at 1462.

Although not dispositive, the prior art may aid in determining the scope of an estoppel. "[A] patentee is estopped from recovering through equivalency that which was deemed unpatentable in view of the prior art." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1219, 36 U.S.P.Q.2d 1225, 1230 (Fed.Cir.1995). After adding a claim limitation during prosecution to overcome prior art, the applicant cannot later assert that the distinguished feature of the prior art is equivalent to the added limitation. *See Litton,* 140 F.3d at 1462. Similarly, the patentee may not assert coverage of a "trivial" variation of the distinguished prior art feature as an equivalent. *See id.* "If sufficient to evince a clear and unmistakable surrender of subject matter," arguments made during prosecution "may [also] estop an applicant from recapturing that surrendered matter under the doctrine of equivalents." *Id.* at 1458. This court, therefore, must consider whether the prosecution history of the Augustine patents precludes Augustine Medical from asserting coverage of the accused blankets under the doctrine of equivalents.

The specifications and file histories of the Augustine patents contain clear representations that not only define the scope of the "self-erecting" limitation, but also show that the claims cover only convective warming blankets which are "self-erecting." The specification of the '188 patent references two primary categories of prior art thermal blankets, conductive and convective. The '188 patent criticizes conductive prior art blankets because they touch the patient. The '188 patent explains that conductive blankets provide little warmth beyond the areas in direct contact with the blanket. Col. 1, ll. 23–30. Outside these local areas of warmth in direct contact with the blanket, conductive blankets transfer only minimal warmth by heat radiation. Col. 1, ll. 33–36. This combination of conductive and radiative heating results in non-uniform heat transfer. The parts of the patient's body in direct contact with the blanket have a significantly higher temperature than the average body temperature while the other parts of the patient's body have a significantly lower temperature. Col. 1, ll. 25–30. Additionally, the '188 specification explains, conductive blankets carry a significant risk of burning the patient's skin at points of direct contact. Col. 1, ll. 30–33.

The '188 patent also criticizes convective prior art blankets. In these blankets, as in the '188 claimed invention itself, a heat transfer medium such as air circulates to provide temperature control. Col. 1, ll. 37–47. Convective thermal blankets are not new. The convective prior art referenced in the '188 patent includes U.S. Patent No. 2,093,834 (Gaugler) which issued in 1937. In fact, Mallinckrodt and Gaymar both claim to have based their blanket design on expired U.S. Patent No. 2,512,-559 (Williams). U.S. Patent Nos. 2,110,022 (Kliesrath) and 4,660,388 (Greene) also disclose certain convective thermal blankets.

The '188 patent specifically discusses the disadvantages of the Kliesrath convective cover. According to the '188 patent, the Kliesrath convective blanket circulates air "inside a flexible bag which has a top insulating layer and a bottom heat conducting layer which contacts the patient." Col. 1, ll. 39–42. According to Kliesrath, the "heat conducting layer" is "a relatively thin sheet of cotton, linen, silk or the like," that allows passage of warm air to transfer heat onto the patient. Kliesrath, col. 2, ll. 4–5, 21–27; col. 1, ll. 31–35. The '188 patent criticizes the structure of the Kliesrath blanket as "unnecessarily heavy and rigid." Col. 1, ll. 42–43. Specifically, the '188 patent complains that "the weight of the blanket can press its inner surface against the covered patient and block a number of the exit ports, thereby reducing the total body area over which the air is circulated." Col. 1, ll. 43–47.

As a solution to the problems of both the conductive and convective prior art blankets, the '188 patent introduces "a lightweight, flexible, inflatable casing [which inflates] into a self-supporting structure

which encloses the patient." Col. 1, ll. 55–66. The specification of the '188 patent thereby invokes its self-erecting structure to distinguish the invention from both convective and conductive prior art thermal blankets. Col. 1, ll. 63–66; col. 2, ll. 12–18.

The '102 patent, dated April 1994, incorporated the description of the prior art in the '188 patent by reference. Col. 1, ll. 16–19. The '102 patent additionally describes the invention of the '188 patent as "a self-erecting, inflatable airflow cover." Col. 1, ll. 19–20. The '102 patent proceeds to describe the operation of the '188 claimed invention: "When inflated, the cover self-erects about a patient, thereby creating an ambient environment about the patient." The '102 patent specification also expressly defines the term "thermal blanket," contained in each of its claims, with reference to the "self-erecting" feature: "the term 'thermal blanket' is meant to invoke a self-erecting, inflatable structure for delivering a thermally controlled inflating medium to the interior of the structure created when the thermal blanket is inflated." Col. 3, ll. 30–34.

After the '102 patent issued, the '320 and '371 patents issued in June 1994 and in April 1995, respectively. Like the '102 patent, the '320 and '371 patents also incorporate the disclosure of the '188 patent by reference and describe the invention as "a self-erecting, inflatable airflow cover." The '320 patent, col. 1, ll. 16–17; the '371 patent, col. 1, ll. 19–20. The Augustine patents therefore identify the "self-erecting" structure as the primary advantage over the prior art. This distinction appears even more prominently in the file histories of the Augustine patents.

■ The prosecution histories of the Augustine patents show that the applicant expressly surrendered coverage of any forced-air blanket other than a "self-erecting" convective thermal blanket which stands off of a patient when in operation. During prosecution of application No. 07/227,189 (the '189 application), a parent application to later applications resulting in the '102, '320 and '371 patents, Augustine Medical canceled or amended all of the original claims in favor of new claims containing the "self-erecting" limitation. Augustine Medical made these amendments in response to the examiner's rejections over the prior art. The prosecution history explains:

> All of the new claims are drawn to a self-erecting, inflatable thermal blanket which bathes a person in a thermally controlled inflating medium. Such a thermal blanket is one which, when inflated, erects about a person, standing off of the person to exhaust the inflating medium which thereby bathes the person in the medium.

During the prosecution of the '189 application, Augustine Medical also presented arguments to overcome the examiner's reliance on the conductive prior art blanket references. Specifically, Augustine Medical argued:

> [T]he airflow cover and the convective thermal blanket, when inflated, stand off a patient. This is vital to the blanket's operation, since contact with the patient would block passage of the inflating medium through the occluded apertures in the undersurface and would prevent the blanket from bathing the patient in an inflating medium.

Because the prosecution history of a parent application may limit the scope of a later application using the same claim term, *see Jonsson v. Stanley Works*, 903 F.2d 812, 818, 14 U.S.P.Q.2d 1863, 1870 (Fed.Cir.1990), these claim amendments and arguments restrict the scope of the claims in each of the later issued patents containing the "self-erecting" limitation.

During prosecution of the application leading to the '102 patent, Augustine Medical again focused on the unique "self-erecting" structure of its blanket to distinguish the Greene and Kliesrath convective prior art. Augustine Medical represented that its "air flow cover consists entirely and solely of an inflatable tubular structure

which, when inflated by an inflating medium, erects about a person." According to the applicant, the structure of the claimed invention differs from Greene because it "permits the thermal blanket to assume the shape of a curved surface which curls downwardly toward its edges from its center and forms a quonset-type structure." Still a further reference in the '102 patent file history argues that "the thermal blanket disclosed and claimed in this application is different from the device disclosed by Greene because it self-erects." Augustine Medical therefore clearly asserted that "the air flow cover of the '188 [patent] and thermal blanket of this application are significantly different from the covers of Greene and Kliesrath" because of this self-erecting structure.

Augustine Medical made representations nearly identical to those discussed with reference to the '102 patent to overcome the examiner's reliance on Greene and Kliesrath during the prosecution of the application leading to the '371 patent. The prosecution history of the '320 patent also contains limiting representations. Specifically, Augustine Medical distinguished over the prior art by stating that the invention covers the "class of convective thermal blankets, or airflow covers ... which are inflatable and which self-erect when inflated. When inflated, these blankets cool or warm a patient enclosed in the self-erected structure."

In sum, during prosecution of the '102,- '320, and '371 patents, Augustine Medical amended the claims to expressly include a "self-erecting" limitation and made clear representations of the scope of that limitation to overcome the prior art. Augustine Medical therefore surrendered during prosecution the coverage it now seeks to reclaim via the doctrine of equivalents. The record of the administrative proceedings before the PTO precludes coverage of allegedly equivalent blankets which rest on a patient and do not inflate themselves into a self-supporting Quonset hut-like structure. The district court therefore erred by declining to grant Gaymar's and Mallinckrodt's motion for JMOL and by entering a permanent injunction against them. Because this court determines that application of prosecution history estoppel bars Augustine Medical from extending the scope of its patent claims to cover the accused devices, this court need not address whether Augustine Medical's proof on equivalence was sufficient to support the jury's verdict.

██ Relying on this court's early statements that pioneering inventions deserve a broader range of equivalents, *see, e.g., Perkin–Elmer Corp. v. Westinghouse Elec. Corp.,* 822 F.2d 1528, 1532, 3 U.S.P.Q.2d 1321, 1323 (Fed.Cir.1987); *Thomas & Betts Corp. v. Litton Sys., Inc.,* 720 F.2d 1572, 1579, 220 U.S.P.Q. 1, 6 (Fed.Cir. 1983), Augustine Medical appears to argue that because its patents "revolutionized the treatment of surgical patients" they deserve broader protection. At the outset, this court notes that no objective legal test separates pioneers from non-pioneers. *See, e.g., Sun Studs, Inc. v. ATA Equip. Leasing Inc.,* 872 F.2d 978, 987, 10 U.S.P.Q.2d 1338, 1346 (Fed.Cir.1989) (stating that pioneer status depends on all factual circumstances). Furthermore, it is impossible for this court or the PTO to predict the future of any given technology and thereby determine the likelihood that an invention will open vast new vistas of innovation. The peripheral claiming system itself, however, makes the best distinction between pioneers and non-pioneers. Pioneers enjoy the benefits of their contribution to the art in the form of broader claims. Without extensive prior art to confine and cabin their claims, pioneers acquire broader claims than non-pioneers who must craft narrow claims to evade the strictures of a crowded art field. Thus, claim scope itself generally supplies broader exclusive entitlements to the pioneer. Moreover, a pioneer generally need not fear traditional limits on the application of the doctrine of equivalents such as prior art or prosecution history estoppel

(because amendments or arguments to overcome the prior art are generally unnecessary in true pioneer applications) – a concept different from Augustine Medical's plea for enhancing the scope of equivalents.

Augustine Medical notes that the extensive convective thermal blanket prior art (with the possible exception of Kliesrath which discussed treatment of diseases) did not explain the use of convective warming blankets for the prevention or treatment of hypothermia. To support its claim for a broader scope of equivalents, Augustine Medical points out that before Dr. Augustine's invention in 1986, doctors had used a variety of ineffective methods to treat hypothermia – such as infra-red heat lamps, hot water mattresses, heat/moisture exchangers, and cotton blankets. Augustine Medical therefore argues that its invention " 'pioneered' the commercialization of convective warming" for the treatment and prevention of hypothermia.

None of Augustine Medical's patents, however, claim a method of preventing and treating hypothermia. Rather, the Augustine patents contain only the apparatus claims discussed above. Even if a court could determine that Dr. Augustine had pioneered a method of treatment, that work cannot expand the coverage of apparatus claims to cover every apparatus used for the same purpose. In sum, although Augustine Medical's apparatus claims give patent protection covering "all uses" for the claimed apparatus, Augustine Medical cannot use the patent laws to proscribe use of another non-infringing apparatus to perform a method which is not claimed.

### III.

With respect to Augustine Medical's cross-appeals, this court first addresses the district court's grant of summary judgment of invalidity with respect to claims 1, 3, 4, and 8 of the '371 patent. This court reviews without deference the requirements for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If any genuine issue of material fact remains in dispute, summary judgment is inappropriate. *See* Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, this court resolves all factual inferences and doubts in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307, 46 USPQ2d 1752, 1755 (Fed.Cir.1998).

 This court therefore examines the record for genuine factual issues with regard to whether claims 1, 3, 4, and 8 are entitled to the July 1990 priority date of the '371 patent's parent application, the '757 application. If these claims deserve the July 1990 priority date, the display in October 1989 of two prototype blankets occurred after the critical date and could not erect a § 102(b) bar.

 The '371 patent issued from an application continued in part from the '757 application. A CIP application contains subject matter from a prior application and may also contain additional matter not disclosed in the prior application. *See Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558, 31 U.S.P.Q.2d 1855, 1857 (Fed.Cir.1994). Different claims of such an application may therefore receive different effective filing dates. *See id.* Subject matter that arises for the first time in the CIP application does not receive the benefit of the filing date of the parent application. *See id.* Thus, the decision on the proper priority date – the parent application date or the CIP application date – for subject matter claimed in a CIP application depends on when that subject matter first appeared in the patent disclosures. To decide this question, a court must examine whether the "disclosure of the application relied upon reasonably convey[s] to the artisan that the inventor had possession at that time of the later claimed subject matter." *Id.* (quoting *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 865, 26

U.S.P.Q.2d 1767, 1774 (Fed.Cir.1993)). This is a question of fact. *See id.*

The magistrate judge found that the '757 application does not disclose the subject matter claimed in claims 1, 3, 4, and 8 of the '371 patent. Therefore, the magistrate judge denied these claims the '757 application's July 10, 1990 filing date. These claims each claim a convective warming blanket which covers only a portion of a patient's body. Although Augustine Medical points to passages from the '757 parent application that it asserts supports the claimed subject matter, these passages, in fact, do not at all relate to the claimed subject matter.

With respect to the lower body blanket in claim 1, for example, Augustine Medical refers to statements by its expert witness that language in the specification discussing drawing the blanket "up to the chin area" supports the claimed subject matter. Specifically, Augustine Medical conclusively asserts that this language, in conjunction with the understanding that care sites must be kept visible and clean, supports a blanket covering any other limited body area below the chin, including the lower body blanket of claim 1. To the contrary, this language does not suggest, let alone disclose, a lower body blanket. Rather, the only discussion of care sites relates to those in the head and neck region. Nowhere is there a suggestion, nor is it inherent, that similar blankets may be constructed for the treatment of other care sites.

Similarly, with respect to claims 3, 4, and 8, the passages pointed to as providing support for the claimed subject matter are insufficient. Claim 3 is dependent on claim 1 and is therefore unsupported for the same reasons as claim 1. Claim 4 covers a blanket which is positioned across the arms and chest of a patient's body. Augustine Medical again points to the statement in the parent application that the blanket could be drawn up to the patient's chin and argues that it is therefore inherent that its blanket "could be positioned in many ways" including transverse disposition of the blanket over a patient's arms and chest. Augustine Medical's conclusory statements are again wholly insufficient to explain how one of skill in the art would find support for the invention in claim 4 from this language of the '757 application. Like claim 4, claim 8 is also directed toward a transverse blanket which covers a patient's arms and chest and is similarly unsupported by the '757 application. For these reasons, no reasonable jury could have found support for claims 1, 3, 4, or 8 of the '371 patent in the '757 application. Accordingly, there is no genuine issue of material fact in dispute and the district court's grant of summary judgment of invalidity with respect thereto was appropriate.

## IV.

Augustine Medical's cross-appeal further challenges the district court's grant of summary judgment of non-infringement with respect to the '188 patent. Claim 1 is the only disputed independent claim of the '188 patent. Claim 1 recites, in part, "an inflatable cover housing including a plurality of inflatable hollow tubes, each tube having a rounded upper portion and a flattened lower portion, joined in a substantially parallel array to form a substantially smooth lower cover surface."

After initially recommending against a grant of summary judgment, on March 15, 1996, the magistrate judge revisited that recommendation on July 18, 1997. In this later recommendation, the magistrate judge concluded that the accused blankets did not infringe the '188 patent claims literally or under the doctrine of equivalents. Specifically, the magistrate judge concluded that the accused blankets did not literally contain tubes, a parallel array of chambers, a flattened lower cover surface, or a substantially smooth lower cover surface. The magistrate judge further concluded that the accused blankets lacked equivalents of these limitations.

■ Although, under the doctrine of equivalents, an element or limitation of the claim is not required to be literally present in the accused device, the accused device must still contain an equivalent of that element or limitation. *See Warner–Jenkinson*, 117 S.Ct. at 1054. In this case, the "flattened lower portion" is completely absent in the accused blankets. The "flattened lower portion" is not literally present because the accused blankets have a quilted lower surface nearly identical to their upper surface. The accused blankets also lack any feature equivalent to the "flattened lower portion."

■ To infringe under the doctrine of equivalents, the accused blankets must contain features which are insubstantially different than the claim elements. Insubstantial differences may be found where a structure performs substantially the same function in substantially the same way to achieve substantially the same result as the claim element. As explained in the specification, the "flattened lower portion" claim element functions together with the "rounded upper portion" to create a structure that avoids contact with the patient.

> When the cover is placed over the patient and inflated, the pressure of one tube against another is collected at the edges of the cover which causes the edges to curl down around the patient toward the [bed] surface.... [T]he inflation of the tubes provides the cover with a self-supporting structure having a generally rounded or elliptical cross-sectional shape which contacts the patient only at the tubes which are immediately adjacent the keystone tube.

'188 patent, col. 4, ll. 7–16. The inclusion of both of these elements is necessary to have a "self-erecting structure" in which the patient can be bathed in the temperature controlled medium. Based on the undisputed facts, no reasonable jury could conclude that there are features of the accused blankets which are insubstantially different than the "flattened lower portion" limitation. The record shows that the accused blankets have nearly identical, quilted upper and lower surfaces and that the blankets rest on and maintain significant contact with the patient when inflated. Augustine Medical is unable to point to and we are unable to identify any features of the accused blankets which could function to create a "self-supporting structure" that avoids contact with the patient. Therefore, because the undisputed facts show that the accused blankets do not literally or equivalently contain every limitation of the '188 patent claims, there can be no infringement. Accordingly, the district court appropriately granted summary judgment of non-infringement with respect to the '188 patent.

## V.

■ Finally, with respect to the district court's dismissal of Gaymar's claim of invalidity regarding the '417 patent, Augustine Medical dismissed with prejudice all claims against Gaymar related to the '417 patent and stipulated that none of Gaymar's products infringed the '417 patent. This court agrees with the district court that this stipulation and dismissal of claims with prejudice eliminated any potential case or controversy and thereby mooted Gaymar's claim of invalidity. This court finds Gaymar's assertions to the contrary unpersuasive.

## VI.

Because prosecution history estoppel bars Augustine Medical from recapturing convective thermal blankets which are not "self-erecting," this court reverses the imposition of the injunction against Gaymar and Mallinckrodt as well as the district court's refusal to grant JMOL of non-infringement. However, because this court concludes that no reasonable jury could find sufficient support for claims 1, 3, 4, and 8 of the '371 patent in the '757 application, this court affirms the district court's grant of summary judgment that these claims are invalid under § 102(b). Furthermore, because the district court

did not err in construing the elements of the '188 patent claims or in applying the "all elements" rule of the doctrine of equivalents, this court affirms the district court's grant of summary judgment of non-infringement with respect to the '188 patent. Finally, because the district court appropriately determined that Gaymar's claim of patent invalidity with respect to the '417 was moot in light of the stipulations of fact entered by Augustine Medical, this court affirms that decision.

## COSTS

Each party shall bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART.*