IMATEC, LTD. and Hanoch Shalit, Plaintiffs–Appellants,

v.

APPLE COMPUTER, INC., Defendant–Appellee.

No. 00–1262.

United States Court of Appeals, Federal Circuit.

July 26, 2001.

Before MAYER, Chief Circuit Judge, MICHEL and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

This is a patent infringement action brought by the plaintiffs Imatec Ltd. ("Imatec") and Dr. Hanoch Shalit against Apple Computer, Inc. ("Apple"). Imatec and Dr. Shalit appeal from a grant of summary judgment by the United States District Court for the Southern District of New York dismissing the plaintiffs claim against Apple on the basis that the patentees are not the owners of U.S. Patent Nos. 4,939,-581 (the "'581 patent"), 5,115,229 (the "'229 patent"), and 5,345,315 (the "'315 patent") (the "Shalit patents"), and therefore lack standing to bring a claim of patent infringement. *Imatec, Ltd. v. Apple Computer, Inc.*, 81 F.Supp.2d 471 (S.D.N.Y.2000). For the reasons discussed below, we *affirm* the judgment of the district court.

## BACKGROUND

The inventor of the patented technology, Dr. Hanoch Shalit, sought to improve the accuracy with which images printed on film match those displayed on a video monitor, to generate accurate representations of images used to diagnose medical conditions such as those resulting from a magnetic resonance imaging ("MRI") scan. Accordingly, the three patents at issue involve systems for matching the image displayed on one output device, such as a video monitor, to that generated by another output device.

The '581 patent, entitled, "Method and System in Video Image Hard Copy Reproduction," is directed toward a method and system for providing accurate photographic reproductions of grayscale images taken from a black-and-white camera and displayed on a video screen. The system described in the '581 patent generates correction data by comparing the luminance values of a grayscale test image displayed on the screen of a video monitor with the luminance values obtained from a photograph taken of the monitor of an electronic camera also displaying the test image. The '229 patent, a continuation-in-part of the '581 patent, is entitled, "Method and System in Video Image Reproduction" and describes a method and system for displaying identical images on two different displays. This invention measures and compares the luminance values of a test image displayed on both display screens and generates correction data so that im-

ages displayed on the second display screen match those displayed on the first. The '315 patent, a continuation-in-part of the '229 patent, is entitled "Method and System for Improved Tone and Color Reproduction of·Electronic Image on Hard Copy Using a Closed Loop Control" and is directed toward a method and system for producing accurate photocopies of grayscale and color images displayed on a monitor. Using a densitometer, luminance values of a grayscale test image displayed on the screen of a video monitor are measured. The luminance values of a photocopy of the test image are also measured. The two sets of data are compared to generate correction data which is used to correct the image data sent to the printer. As a result, the hard copy image matches the image displayed.

Representative claim 13 of the '315 patent, provides:

13. The method of producing a series of color hard copy images which are accurate reproductions of the colors of video images on a video monitor screen without affecting the video monitor screen images, including the steps of:

forming a test video image on the screen of the video monitor, measuring the colors of the test image on the monitor screen using an electronic meter to provide a set of monitor screen color values, and entering the set of monitor screen values into a computer;

forming a test image on the hard copy using a hard copy printing system, said printing system including electronic means to vary the control signals to control the color intensity printed by said printing system on a dot-by-dot basis, the hard copy test image having predetermined colored areas including defined areas differing color intensities; printing said hard copy test image to produce a color printed image of said

hard copy test image using the same batch of hard copy color reproduction materials as will be thereafter used by the printing system to print the images from the video monitor; sensing the color differences on the hard copy test image using a photoelectric densitometer and entering the sensed color differences into the computer; comparing said entered hard copy color difference values with the set of monitor color values stored in computer memory; using the computer to calculate and generate a set of corrections to said control signals for each color value for each dot printed by said printing system based on the said comparison, and altering the colors printed by said printing system according to said set of computer produced corrections using the electronic means of said printing system.

According to the disclosure of the '315 patent, a black-white grayscale test pattern is generated by the output device, as a photocopy or photograph, and the luminance of the image is measured by a densitometer. The signals read by the densitometer of the test pattern are sent to a computer. Using a look-up table filled with "standard" density values–corresponding to values obtained using a spot photometer measured from the monitor while the test pattern is displayed–the computer compares the "standard" values to the actual values measured. Based on this comparison, compensation data is generated and used to correct input dot print density values of all input images.

Before filing the patent applications, which eventually issued as the disputed patents, Dr. Shalit was an employee of FONAR Corporation ("FONAR"), a manufacturer of MRI equipment. Dr. Shalit began working for FONAR on June 29, 1987, as head of FONAR's photographic physics department. Dr. Shalit was an

employee of FONAR until November 14, 1988, when he became president of FO-NAR Photographic Services, an entity legally separate from FONAR. Nine days later Dr. Shalit filed the first of the three patent applications. Dr. Shalit remained a consultant to FONAR until December 26, 1989, at which time Dr. Shalit founded Imatec and became its president and chairman.

As a condition of employment with FO-NAR, Dr. Shalit was required to enter into an "Agreement with Respect to Assignment of Inventions and Confidential Information." The assignment agreement provides:

"I agree to assign, and hereby do assign, to FONAR ... all my rights to inventions which I have made or conceived or which I may hereafter make or conceive, either solely or jointly with others, in the course of [my] employment, or with the use of the time, material or facilities of FONAR, or relating to any product, method, substance, machine, article of ... manufacture or improvements therein within the scope of the business of said FONAR...."

The agreement expressly excludes from its scope patents covering inventions Dr. Shalit listed in a designated space. In the space provided, Dr. Shalit wrote: "single step laser printing" and "photographic video recording for keeping records of video tape content." He did not list any pending patent applications and did not describe any inventions except the two phrases noted.

Dr. Shalit was hired by FONAR to develop a system that would produce an accurate photographic reproduction of an MRI-generated image as it appeared on a video monitor. During his term of employment at FONAR, Dr. Shalit developed such a system, styled the "Perfect Image System," which produced photographic images that accurately represented those displayed.

Apple manufactures and sells ColorSync. ColorSync is software that is used to match color images on various peripheral devices (e.g., scanners, monitors, printers) connected to a computer. The ColorSync system uses "device profiles" which "are computer files that contain information about a device's color capability." These "device profiles" correlate device-dependent color values of a particular imaging device to an objective, three-dimensional, device-independent color space. Accordingly, device profiles enable the translation of the device-dependent RGB (red, green and blue) values or CYMK (cyan, yellow, magenta and black) values associated with a given electronic output device to and from device-independent values such as those defined by the CIE XYZ color space (a reference color space created by the CIE (Commission Internationale de l'Eclairage) using imaginary primary reference colors XYZ). Device profiles can be generated using measurement instruments such as a densitometer. When a user creates a device profile by taking actual measurements of a particular device, the measurements are subject to transformations and normalizations prior to storage.

Although device profiles enable the translation of device-dependent values into and out of a device-independent color space, the actual translation is performed by a Color Matching Module ("CMM") that is embedded within ColorSync. Using the information that is contained within the device profile of the output device displaying the image, the CMM translates that device's device-dependent representation of the image into a device-independent representation of the image. Then, using the information that is contained within the device profile of the destination output device, the CMM translates the device-

independent representation of the image into a representation expressed in terms of the device-dependent values of the destination output device.

On February 13, 1998, Imatec filed the present lawsuit against Apple alleging infringement of the Shalit patents. In response, Apple filed a motion to dismiss the action for lack of standing. In that motion, Apple claimed that Dr. Shalit had patented the inventions that he was hired by FONAR to develop. Apple argued, therefore, that in accordance with the assignment agreement, Dr. Shalit had been divested of title to those inventions. According to Apple, Dr. Shalit had made a present grant of a future interest and thus, surrendered legal title to the inventions he created while at FONAR. Imatec answered the motion and argued that the agreement provided exceptions to inventions for which Dr. Shalit had relinquished his rights, and that those exceptions covered the inventions claimed in the patents.

The district court determined that the contract language pertaining to the exclusion did not describe the inventions claimed in the Shalit patents. Specifically, the district court found that the exclusion was limited to systems for "keeping records of videotape content," in contrast to the subject matter of the patents that involve systems for accurately reproducing images displayed on a monitor. The district court acknowledged that the patents make vague reference to a VCR as one possible source of image data, but determined that the tangential nature of that reference is in stark contrast to the emphasis placed on the use of videotape in the invention described in the disputed clause of the assignment agreement. The court reiterated that the patented inventions recited systems for matching the image produced as a hard copy reproduction with the image displayed on a monitor.

Because the inventions described in the patents do not involve keeping records of videotape content, the court concluded that the patented inventions do not fall under the exclusions provided for in the agreement. Accordingly, the district court determined that Dr. Shalit had assigned his rights in the patents to FONAR and that he and Imatec lacked standing to bring an action for infringement of those patents. 81 F.Supp.2d at 483.

Moreover, the district court also concluded, on appellees' motion for summary judgment, that Apple's ColorSync system does not infringe the claims of the patents as properly construed. The district court determined that, in light of the intrinsic evidence, the claims required a direct comparison of luminance values measured directly from the two image sources. Based on that claim construction, the district court determined that the accused device does not infringe. The district court found that in Apple's ColorSync system, ideal monitor values are usually generated from manufacturers' specifications rather than from measurements taken. The court further found that even in situations in which the accused device generates a "device profile" by taking actual measurements, the "measurements are not input into a monitor profile directly but instead are subject to transformations and normalizations." 81 F.Supp.2d at 488. Thus, the district court determined that the ColorSync system does not use measured values generated "without transformation."

The district court further concluded that the ColorSync system does not "compare by subtraction" as required by the claims. 81 F.Supp.2d at 487. Specifically, the court found that the ColorSync system employs "device profiles" to translate the representation of an image from the device-dependent values, associated with one electronic output device, into device-inde-

pendent values defined by the CIE XYZ color space. Next, the court indicated that the ColorSync system translates the device-independent representation of the image into device-dependent values associated with another electronic output device. Thus, the court determined that "[t]he device-dependent values of the second output device, which may well be expressed in CMYK terms, are never subtracted from or otherwise directly related to the device-dependent values of the first output device, which may be expressed in RGB terms." *Id.* at 488. The court concluded that the ColorSync system does not perform the claimed subtractive comparison as required by the representative claim.

The court further noted that claim 13 of the '315 patent required generation of a set of correction values "for each color value for each dot printed," and that the specifications of the patents reveal that each color value is separately corrected. *Id.* Construing the claimed step for generating correction values to require separate processing of input data for each primary color, the district court found no infringement on the alternative basis that the ColorSync system transforms all of the colors in a source image simultaneously, not separately as claimed.

Concluding that no genuine issues of material fact were in dispute, and in light of the facts recited, the district court concluded that no reasonable fact-finder could find infringement. Imatec appeals the court's conclusion that the plaintiffs lacked standing, and the court's finding, in the alternative, that the claims of the patents were not infringed. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1)(1994).

### STANDARD OF REVIEW

■ The question of standing to sue for patent infringement is a jurisdictional one, which we review *de novo*. *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551, 35 USPQ2d 1065, 1074 (Fed.Cir.1995) (*en banc*). To the extent jurisdictional facts are in dispute, however, the trial court's findings of fact are reviewed by this court for clear error. *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989).

■ The question of ownership of patent rights, normally based on rights established by contract, is therefore typically a question exclusively for state courts. *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572, 42 USPQ2d 1119, 1123 (Fed.Cir.1997). Thus, determining whether the right to sue for prior infringement has been transferred turns on the proper construction of the assignment agreement, which is a matter of state contract law. *Minco Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117, 40 USPQ2d 1001, 1006 (Fed.Cir.1996) (per curiam).

■ In New York, the issue of whether a contract is ambiguous is in the first instance an issue of law within the province of the court. *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 450 N.Y.S.2d 460, 462, 435 N.E.2d 1075, 1078 (1982). If the language of the contract is unambiguous, then the interpretation of the contract is a question of law for the court. *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 346, 489 N.E.2d 231, 233 (1986). Where the language used is susceptible to differing interpretations, then the interpretation of the contract becomes a question of fact for the jury and extrinsic evidence of the parties' intent properly is admissible. *Hartford Accident & Idem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973).

■ This court reviews a district court's grant of summary judgment without defer-

ence. *Cortland Line Co. v. Orvis Co.*, 203 F.3d 1351, 1355, 53 USPQ2d 1734, 1746 (Fed.Cir.2000). The moving party is entitled to summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing the district court's grant of summary judgment, this court draws all reasonable inferences from the evidence in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Similarly, it is well settled that in New York summary judgment may be granted where a contract is clear and unambiguous on its face or where the ambiguity can be resolved without resort to extrinsic evidence. *Hartford Acc. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 909 (1973).

## DISCUSSION

We must first address whether the district court correctly concluded that Dr. Shalit assigned his rights in the patented inventions to his employer, or whether he expressly excluded those inventions from the assignment agreement. To determine whether he assigned those inventions, we must construe the contract to determine its scope. Our primary objective is to determine the intent of the parties to the contract, as revealed by the language they chose to use. *Id.*

In the agreement, Dr. Shalit specifically listed two inventions that he wished to exclude from the assignment agreement. Dr. Shalit argues that the language provided, in relevant part, describes the patented inventions, thereby exempting the Shalit inventions, thereby exempting the Shalit patents from its scope. Alternatively, he argues that, at a minimum, the language is ambiguous and raises a material question of fact. We agree with the district court's conclusions that the exclusion clause of the assignment contract was unambiguous and did not provide for the exclusion of the patented inventions.

In accordance with the language of the assignment agreement, Dr. Shalit made a present assignment of all inventions he would make as an employee of FONAR. Specifically, the contract provides: "I agree to assign, and hereby do assign ... all my rights to inventions which I have made or conceived or which I may hereafter make or conceive ... in the course of such employment...." So long as he had not excluded his invention from the scope of the contract, Dr. Shalit expressly granted to FONAR his rights in any invention he had already created and in any invention he developed while an employee of FONAR. No further act would be required. Once an invention came into being, the transfer of title would occur by operation of law. *Filmtec Corp. v. Allied–Signal Inc.*, 939 F.2d 1568, 1573, 19 USPQ2d 1508, 1511 (Fed.Cir.1991).

In the space provided, Dr. Shalit referred to one of the inventions he wished to exclude as "photographic video recording for keeping records of video tape content." In accordance with the plain language of that description, we note the express requirement that a "photographic video recording" be made of "video tape content" for the purpose of "keep[ing] records." Significantly, we note the dissimilarity with the patents' description of a process and system for generating correction data for creating a printed image that *matches* the image displayed on a monitor.

We recognize, as the district court did, that the patents state that one of the sources of data to be displayed may be a

VCR. In light of that recognition, Imatec argues that printing of still images from video images displayed on a monitor, generated from a video tape (VCR tape), demonstrates that the disputed terminology was intended to encompass the patented inventions. In further support of its argument that the patents' reference to a VCR tape as a source of image data demonstrates that the patented inventions were intended to be exempted from the assignment, appellants repeatedly emphasize that the title of the '581 patent, "Method And System In Video Image Hard Copy Reproduction," also resembles the terms used in the agreement to describe the excluded invention.

We conclude that the district court correctly determined that the patented inventions fall under the assignment agreement and are not excluded from it. In the disputed clause of the agreement, Dr. Shalit referred to the invention for which he sought an exclusion as "photographic video recording for keeping records of videotape content." The patented inventions, on the other hand, are drawn to much more than "keeping records." The patented inventions involve a system for ensuring the match of images displayed on two separate output devices; in other words, that reproductions of an image displayed would be an accurate representation of that image. Nothing in the disputed clause suggests that the inventions for which Dr. Shalit sought an exception involved "matching" or creating an "accurate" or "true copy" of the displayed image—the focus of the patented invention. The disputed clause does not indicate that the camera image ('581 patent), or the displayed image ('229 patent) or the recorded image ('315 patent) is processed to create an exact reproduction of the one displayed. Dr. Shalit's failure to even mention display of images or the use of a monitor in that clause, further suggests a disconnect with the claimed invention.

Additionally, Dr. Shalit's use of the term "video tape" to identify the source of the image would appear to be a critical aspect of the invention for which he sought an exemption, particularly in light of the brevity of the description. The allusion to the use of videotape as a possible source of the input image data recited in the written descriptions of the patents can hardly give rise to a finding that the use of a video tape is critical to the operation of the patented inventions. Indeed, the patents place no emphasis on the use of videotape as a source of the data, but merely list it as an alternative to the display of computer generated images or to the display of images obtained using a camera. Contrarily, the object of the patented inventions is to match the image output by one device to the image displayed on a monitor, regardless of the source of the input data.

Finally, we note that, to avoid such disputes, FONAR dedicated an entire paragraph within the agreement to recommend that the employee document the inventions that they wish to exclude from the agreement, particularly if the subject matter sought to be excluded is of the type in which the company would likely be interested. Specifically, the agreement explained that it was in the employee's own interest "that records should be made of the inventions he possesses at the time of employment" which the employee wishes to exclude. That Dr. Shalit chose not to avail himself of this opportunity to further clarify the subject matter for which he sought an exemption, in light of the fact that he now seeks to exclude from the scope of the agreement the subject matter that formed the basis for his employment, further supports the district court's interpretation of that clause.

Dr. Shalit may have chosen to describe the patented inventions using vague and seemingly unrelated language in the hope of preserving the opportunity to later assert rights in the inventions which under the employment contract he was required to assign. We note that Dr. Shalit was hired by FONAR to develop the patented inventions and actually reduced those inventions to practice while employed there. Dr. Shalit admits that he began drafting the patent applications while an employee of FONAR. Dr. Shalit filed the first of his patent applications only nine days after leaving FONAR's direct employment. We further note that FONAR did not learn that he had applied for the patents until Dr. Shalit initiated this infringement suit.

In light of such evidence, it would appear that Dr. Shalit either perfected the inventions while an employee of FONAR and sought to patent them immediately thereafter, or attempted to mislead FONAR into believing that he had agreed to assign his rights in inventions for which he was hired to develop and in fact developed while an employee of FONAR. Assuming the latter, we should not construe the contract to exempt inventions which fall within the scope of the agreement, on the basis of vague language used with the intent to mislead. *Otis Elevator Co. v. Heggie Realty Corp. Inc.*, 107 Misc.2d 67, 437 N.Y.S.2d 832, 833 (N.Y.App.Div.1980) (per curiam) ("[a] party may not, even innocently, mislead another and then claim the benefit of his deception.").

■ Where, as here, a contract's language is unambiguous and the words are plain and clear, effect must be given to the intent of the parties as reflected by the express language of the agreement. *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 346–47, 489 N.E.2d 231, 233–34 (1986). Whether intentionally misdescriptive or not, because the language employed by Dr. Shalit does not sufficiently evoke the concepts of the patented inventions, Dr. Shalit cannot now complain that the patented inventions were expressly exempted from the scope of the assignment agreement. Accordingly, the patented inventions developed while he was an employee of FONAR fall within the scope of the assignment agreement.

In sum, we conclude that the disputed language of the assignment agreement does not accurately describe the inventions claimed in the Shalit patents. Significantly, had Dr. Shalit intended to exclude inventions encompassing the subject matter for which FONAR had specifically hired him to develop, one would expect the language chosen by Dr. Shalit to reflect more accurately the subject matter of the patented inventions. The disputed clause of the assignment agreement fails to provide a suggestion that the recorded image is a particularly accurate representation of the image displayed on a monitor, emphasizing instead that the invention involves "video tape content" recording. Had Dr. Shalit intended to exclude the technology he was hired to develop, he should have expressed such an intent with precision. Even were the court to have concluded that the terms were ambiguous, in accordance with New York law, such terms must be construed against the drafter of those terms. *Jacobson v. Sassower*, 66 N.Y.2d 991, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283, 1284 (1985). Here, Dr. Shalit drafted the exception to the assignment agreement which he now claims to exempt the patent. In either event, we are compelled to affirm the district court's conclusion that the patented inventions fall within the scope of the assignment agreement.

Imatec has failed to show that a material issue of fact remains in dispute regarding ownership of the patents. Having properly concluded that Dr. Shalit did not own

the rights to the patents, the district court correctly concluded that both he and Imatec lacked standing to bring this infringement suit.

In *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 45 USPQ2d 1633 (Fed.Cir. 1998), we state: "After correctly determining that Textile had no standing to assert a claim of patent infringement, the district court denied all other pending motions as moot and dismissed the entire action with prejudice. The district court correctly dismissed the infringement claim with prejudice because Textile had its chance to show standing and failed." 134 F.3d at 4185, 45 USPQ2d at 1636. Thus, because neither Imatec nor Dr. Shalit had standing to bring the infringement action against Apple, we conclude that the remaining issues are rendered moot.

Accordingly, the judgment of the district court is affirmed. No costs.